UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 09-20762-CIV-LENARD/GARBER

I.T.N. CONSOLIDATORS, INC. AND
I.T.N OF MIAMI, INC.,

      Plaintiffs,

v.

NORTHERN MARINE UNDERWRITERS
LTD., individually and as agents for LLOYDS of
LONDON, WATKINS SYNDICATE (WTK/457),

      Defendants.

_____/

## PLAINTIFF ITN'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs I.T.N. Consolidators, Inc. and I.T.N. of Miami, Inc. (hereinafter "ITN") respectfully

move this Court for the entry of an Order of Summary Final Judgment on all remaining issues.  ITN

has separately filed its Statement of Material Facts.  The basis for this motion is provided in the

following memorandum:

## MEMORANDUM

## I.
## INTRODUCTION

The instant motion arises on remand from the United States Court of Appeals for the

Eleventh Circuit in *I.T.N. Consolidators, Inc. v. Northern Marine Underwriters Ltd.*, 464 Fed. Appx.

788 (11th Cir. 2012).  After reviewing the parties' Joint Status Report (D.E. 102), in an Order dated

May 24, 2012 (D.E. 104),  the Court instructed that any Motions for Summary Judgment be filed on

or before June 29, 2012.  We understand that Defendant Northern Marine Underwriters Ltd.,

individually and as agent for Lloyds of London, Watkins Syndicate (WTK/457) ("Northern

Marine"), will also be filing a Motion for Summary Judgment.

The parties are in agreement that the facts relevant to the disposition of the issue of insurance coverage by Northern Marine (which is the only remaining issue other than pre-judgment interest, *see infra* note 2) are uncontradicted.  As stated more fully in ITN's Statement of Material Facts, ITN claims coverage by Northern Marine of a shipment of electronic goods belonging to Alpha Company, S.A. ("Alpha") that was hijacked en route from Miami to Ciudad del Este, Paraguay on November 7, 2007.  ITN verbally reported the loss to Northern Marine's agent a day later (*see* Tafur Affidavit, ¶¶ 2-3, pp. 1-2; Seikaly Affidavit, ¶ 11, p. 3); and on the same day ITN generated a Certificate of Insurance (COI) from Northern Marine's website  for the lost shipment (D.E. 15-1). This Court already has found as a fact (*see* D.E. 81 at 4) that Northern Marine knew of the loss prior to the issuance of the COI.[1]  *See infra* pp. 4-5.  In fact, knowing of the loss, it was *Northern Marine* that advised  ITN to issue the COI.

The Court of Appeals held that the loss was not covered by the existing Northern Marine policy.  *See* 464 Fed. Appx. at 791, 794.  However, the Court of Appeals also recognized a factual question--whether ITN and Northern Marine nevertheless had made a new agreement to insure this loss.  *See id*. at 794-95 (emphasis in original):

> That coverage did not automatically arise for this lost shipment is not to say that Northern could not have *voluntarily* contracted to insure the lost shipment. Northern, knowing of the loss, could have nonetheless billed ITN the premium called for by the COI

---

[1]*See also* the Court of Appeals Opinion, 464 Fed. Appx. at 790, 794, 795 ("The parties dispute whether Northern knew of the loss prior to the issuance of the COI; the court, however, found that all parties were aware of the loss when ITN generated the COI"; "*Both* ITN and Northern Marine knew about the loss before the COI issued" (emphasis in original); "Because all parties knew of the loss . . ."; "Northern, knowing of the loss . . ."; "Considering that both parties knew of the loss before the COI issued . . .").

as if no loss had occurred. The consideration exchanged might have been, for instance, the furtherance of Northern's relationship with ITN, or the encouragement of the practice ITN claims it followed: the invariable payment of premiums on every shipment. The question, then, becomes whether ITN and Northern contracted to insure the lost shipment.

### C.

In sum, the issue in this case is thus not whether the COI conflicts with the terms of the open cover policy. Notwithstanding the mechanism for automatic coverage for a not-lost shipment under the open cover policy, it is entirely possible for Northern to insure a shipment that was lost before the COI issued--provided that both Northern and ITN knew about the loss before hand. ITN would inform Northern of the loss, then issue the COI and submit it along with the premium. If Northern wanted to insure the shipment, it would, at this point, accept the contract formed by the COI by keeping the premium payment. To be clear, Northern was not bound by the open cover policy to accept the risk because the contract would be *nudum pactum* if solely to insure an already-lost shipment. The post-loss COI--and the retention of the premium paid on it--would reflect instead a voluntary contractual agreement. Considering that both parties knew of the loss before the COI issued, any purported misrepresentation that no loss had occurred--and therefore any *uberrimae fidei* argument--would be irrelevant to the contract formation.

Insurance coverage in this case, then, turns on whether Northern in fact agreed to insure the lost shipment. That question in turn depends on whether Northern accepted ITN's premium payment, thereby consummating the contract to insure the lost shipment. ITN claims it paid the premium at the time the COI issued, and that Northern initially kept the payment for some time. Apparently, Northern attempted to return the premium to ITN at some point after this litigation had commenced. Therefore, in addition to resolving the convoy-requirement issue it declined to address, the district court should determine whether Northern in fact accepted ITN's premium payment such that a contract to insure the lost shipment was formed.FN13

*****

FN13. To be clear, in so determining whether a contract was formed,

the district court will necessarily determine whether there was consideration--such as that mentioned in part II. B, *supra*--underlying the agreement to insure the lost shipment, and therefore whether the premium--if it was accepted--backed a contract rather than simply an unenforceable promise to insure.[2]

# II.
## ARGUMENT

A.    *The Evidence Is Uncontradicted That the Parties Made a Contract for Coverage of the Lost Shipment.*

The Court has found (*see* D.E. 81 at 4), and there is no conflict of fact, that Northern Marine knew of this loss before ITN obtained the COI (D.E. 15-1) from Northern Marine's website on November 8, 2007, the day following the loss.  *See* Tafur Affidavit, ¶ 2, p. 1; Seikaly Affidavit, ¶ 11, p. 3.  The COI liquidated the value of the shipment at $1,035,000.00, and described the date of the shipment, the loss payee, and other terms and conditions.  Moreover, it was Northern Marine that actually advised that ITN should issue the COI, *after* Northern Marine had learned of the loss.  Edward Tafur, a broker with Fidelity & Marine, Inc., whose parent company, NSI Insurance Group, is Northern Marine's surplus lines agent, states in his Affidavit that he was told of the loss by ITN on the morning of November 8, 2007; he informed Graham Hooper of Northern Marine that day; and "Mr. Hooper advised me to have ITN issue the certificate of insurance, even though he was then

---

[2]The passage referred to in part II. B of the Opinion is the first paragraph of the Opinion quoted above.  The Court of Appeals' reference to the "convoy requirement issue" refers to a provision of the insurance policy that the appellate court ruled did not apply.  Therefore, as the parties agree, *see* Joint Status Report, D.E. 102, ¶ 1B, the convoy issue is moot.  For the same reason, the provision of the policy calling for payment of the declared amount of $1,035,000.00 plus 10% in the event of a dispute (quoted at D.E. 28 at 6) is also moot, because the policy has been held not to apply.  However, the amount of damages has been liquidated at $1,035,000.00, the amount stated on the Certificate of Insurance (COI) through which the new contract between the parties was made. *See infra*.  We will address the applicable measure of pre-judgment interest in this motion.

4

aware that the loss had already occurred.  I advised ITN to do so."  Tafur Affidavit, ¶¶2, 3, p. 2.

Likewise, Oscar Seikaly of NSI confirms in his Affidavit that Northern Marine told Mr. Tafur to

"have ITN issue the certificate of insurance after we [NSI] had reported the loss to NMU [Northern

Marine]."  Seikaly Affidavit, ¶11, p. 3.[3]

Northern Marine raised no objection after issuance of the COI.  In fact, on December 17,

2007, Northern Marine through its broker billed ITN for the premium on the lost shipment; on

January 30, 2008, ITN paid the premium; Northern Marine received and accepted the premium on

February 8, 2008; Northern Marine then waited for more than three months after issuance of the COI

before denying the claim; and Northern Marine then retained the premium for more than twenty

months after denying the claim, of which seven months was after this lawsuit was filed, before even

tendering it back.  *See* Seikaly Affidavit; Cabrera Declaration.[4]

It is also undisputed that during the three months before Northern Marine finally rejected the

claim, ITN and Northern Marine continued to do business under the policy.  During roughly that

post-loss period of time (November 8, 2007 to February 11, 2008), in reliance upon the continuing

business relationship, ITN generated COI's for no less than 36 separate shipments, incurring

premiums paid to Northern Marine totaling $48,850.67 (*see* Cabrera Declaration, ¶ 3, p. 2, and Ex.

---

[3]This evidence is uncontradicted.  However, even if Northern Marine had not itself instructed that the COI issue, the conclusion would be the same.  As noted above, ITN obtained and posted the COI from Northern Marine's website, signifying coverage, after both parties knew of the loss; after learning of the loss, Northern Marine said nothing; to the contrary, Northern Marine billed for the premium through its agent; ITN paid the premium; and Northern Marine accepted and retained the premium.  That was a contract whether Northern Marine solicited the COI or not.

[4]The tender was made in Northern Marine's Reply Memorandum after both sides had moved for Summary Judgment (D.E. 34 at 10).

4).[5]  Moreover, ITN also continued to make shipments during that three-month period for which COI's were later issued.  Thus, ITN paid Northern Marine a substantial amount in premiums based on the assumption of a continuing legal relationship.

Under these circumstances, the parties made an enforceable contract to insure the lost shipment.  Several settled principles of Florida law require this conclusion.  We will review these general principles, and apply them to the undisputed facts.

       *1.*     *Principles of Contract Formation and  Consideration Under Florida Law.*

*First*, the determination of an offer and acceptance, and thus the formation of a contract, depend not upon the parties' subjective intentions, but upon the objective import of their actions or inactions.  In the familiar formulation:  "The making of a contract depends not on the agreement of two minds in one intention, but on the agreement of two sets of external signs--not on the parties having meant the same thing but on their having said the same thing."  *Gendzier v. Bielecki*, 97 So. 2d 604, 608 (Fla. 1957).  *See Harrington v. Citizens Property Ins. Corp.*, 54 So. 3d 999, 1002 (Fla. 4th DCA 2010) ("Thus, meaning is derived from the parties' unambiguous language, not from their subjective understandings").  The formation of this contract inheres in the parties' actions and statements.  Whether Northern Marine accepted the premium for this shipment with a subjective intention of making a contract is irrelevant.[6]

*Second*, in deciding whether an offer and acceptance are supported by consideration, the Court's function is to determine whether there is any legal burden or benefit--not to appraise their

___

[5]*See, e.g.,* Cabrera Declaration, Ex. 1, p. 1; Ex. 2, p. 2 (Certificate 1194882150, November 12, 2007--shipment sailed November 1, 2007).

[6]As also noted, *infra* note 13, no theory of mistake is available on the uncontradicted facts of this case.

"sufficiency" (our quotations).  The court said in *Ashby v. Ashby*, 651 So. 2d 246, 247 (Fla. 4th DCA 1995):  "To conclude that consideration is fair or unfair, rather than merely extant, is not the proper province of the court."  "[A] promise, no matter how slight, can constitute future consideration so long as a party agrees to do something that they are not bound to do." *Diaz v. Rood*, 851 So. 2d 843, 846 (Fla. 2d DCA 2003).[7]

*Third*, in making an insurance contract, even before the premium is paid, an agreement to accept the coverage (here, by the solicitation, receipt and retention of the COI) constitutes adequate consideration.  *See Robinson v. John E. Hunt & Associates*, 490 So. 2d 1291, 1293 (Fla. 1st DCA 1986); *Duncanson v. Service First, Inc.*, 157 So. 2d 696, 699 (Fla. 3d DCA 1963).

*Fourth*, actually paying the premium necessarily also constitutes consideration for a contract of insurance.  Section 627.041(2), Fla. Stat., defines "premium" to mean "the consideration paid or to be paid to an insurer for the issuance and delivery of any binder or policy of insurance."  Even apart from the statute, payment of the premium obviously constitutes consideration.[8]  Here it was Northern Marine, knowing that the shipment had been lost, that both requested that the COI issue, thereby creating liability for the premium, and billed ITN for the premium; accepted payment of the premium by ITN; and then kept the premium for over 20 months.  That was an offer and acceptance, supported by consideration, and thus a new contract.  *See Fireman's Fund Ins. Co. v. Pohlman*, 485

---

[7]*Accord, Chen v. Cayman Arts, Inc.*, 2011 WL 782279, *8 (S.D. Fla. Feb. 24, 2011) (Fla. law); *Bhim v. Rent-A-Car Center, Inc.*, 655 F. Supp. 2d 1307, 1312 (S.D. Fla. 2009) (Fla. law); *Cintas Corp. No. 2 v. Schwalier*, 901 So. 2d 307, 309 (Fla. 1st DCA 2005).

[8]*See Reliance Life Ins. Co. v. Gray*, 89 Fla. 20, 102 So. 2d 764 (Fla. 1925); *Southern Mutual Aid Ass'n v. Cobb*, 60 Fla. 198, 209, 53 So. 505, 509 (1910); *Serchay v. State Farm Florida Ins. Co.*, 25 So. 3d 652, 654 (Fla. 4th DCA), *review denied*, 46 So. 3d 567 (Fla. 2010); *Nationwide Mutual Ins. Co. v. Mason*, 218 So. 2d 185 (Fla. 4th DCA), *cert. denied*, 225 So. 2d 912 (Fla. 4th DCA 1969).

So. 2d 418, 420 (Fla. 1986) ("[T]he addition of an automobile to an existing policy of insurance along with an additional premium constitutes a separate and severable contract of insurance"); *Government Employees Ins. Co. v. Stafstrom*, 668 So. 2d 631, 632 (Fla. 5th DCA), *review denied*, 677 So. 2d 841 (Fla. 1996).  And because the contract had been made and breached by the time Northern Marine tendered back the premium (seven months after this lawsuit was filed), doing so had no legal effect.[9]

    *Fifth*, even the temporal possession of money--here, Northern Marine's retention of the premium for more than 20 months before its tender--has a value that supports consideration for a contract.  For example, the theory of awarding pre-judgment interest in Florida is a "loss theory," "defining the loss as the wrongful deprivation of property."  *Insurance Co. of North America v. Lexow*, 937 F.2d 569, 571-72 (11th Cir. 1991), *citing Argonaut Ins. Co. v. May Plumbing Co.*, 474 So. 2d 212, 215 (Fla. 1985), *and Crockett v. State Farm Fire and Casualty Co.*, 849 F.2d 1369, 1372 (11th Cir. 1988).  An award of pre-judgment interest is given "'not to penalize the losing party, but rather to compensate the successful claimant for losing the use of the money between the date he or she was entitled to it and the date of judgment.'"  *Catalfumo v. Catalfumo*, 704 So. 2d 1095, 1100 (Fla. 4th DCA 1997), *review denied*, 717 So. 2d 529 (Fla. 1998), *quoting Morris v. Morris*, 724 P.2d 527, 529 (Alaska 1986).  *Accord, Mathers v. Brown*, 21 So. 3d 834, 839 (Fla. 4th DCA 2009).

---

    [9]Indeed, even if Northern Marine had not by that time declined coverage, its tendering back the premium would be nothing more than an anticipatory repudiation or breach of a contract already made.  *See Blue Lakes Apartments, Ltd. v. George Gowing, Inc.*, 464 So. 2d 705, 708 (Fla. 4th DCA 1985) ("[T]he seller terminated the contract by twice returning the buyer's  deposit.  It is difficult to conceive of a more clear-cut act of repudiation").  *Accord, Southeastern Integrated Medical, P.L. v. North Florida Women's Physicians, P.A.*, 50 So. 3d 21, 23-24 (Fla. 1st DCA 2010); *A.I.C. Trading Corp. v. Susman*, 40 So. 3d 769, 773 (Fla. 3d DCA 2010), *review denied*, 59 So. 3d 109 (Fla. 2011); *Southern Crane Rentals, Inc. v. City of Gainesville*, 429 So. 2d 771, 773 (Fla. 1st DCA 1983).  *See also Restatement (Second) of Contracts* § 253.

Therefore, the calculation of pre-judgment interest is purely ministerial: "After determination of the amount of damages and the defendant's liability, the plaintiff is to be made whole by an award of pre-judgment interest from the date of the loss." *Lexow*, 937 F.2d at 572, *citing Argonaut*, 474 So. 2d at 215.

Mindful that the Court's function is to determine the *existence* of consideration, not the *sufficiency* of consideration, *see supra* pp. 6-7, even if for some reason Northern Marine's acceptance of the COI and premium were not found to create a contract, Northern Marine's retention and use of the money for more than 20 months alone would constitute adequate consideration for coverage.

*Sixth,* even if the Court were to hold that Northern Marine's generation and retention of the COI after learning of the loss, and its billing for and acceptance of the premium, did not themselves make a contract, the evidence is uncontradicted, in the words of the Court of Appeals, that in billing for and accepting the premium for the lost shipment, part of "[t]he consideration exchanged" was "the furtherance of Northern's relationship with ITN, or the encouragement of the practice ITN claims it followed: the invariable payment of premiums on every shipment." 464 Fed. Appx. at 794. Mindful that the standard is objective--based upon the ostensible import of Northern Marine's actions, not upon its subjective intentions or derelictions--Northern Marine's acceptance and retention of the premium for this shipment--indeed, of every shipment made by ITN for the Alpha Group (indeed, of every shipment made for *every* ITN shipper)--objectively constituted ample inducement and consideration for ITN to:  a) generate COI's after the loss for shipments made before the loss; and b)  continue to insure future Alpha (and other) shipments with Northern Marine between the time of the loss and the time Northern Marine repudiated its contractual obligations.

9

*See supra* pp. 5-6.

The burden to Northern Marine was the provision of coverage--the compromise of what the Court of Appeals found to be a valid defense to coverage.  The benefit was the prospect of continued business with ITN--a prospect that paid off handsomely, given the business that ITN and its shipper, Alpha, generated.  *See supra* pp. 5-6.

As to the burden, in the appellate court's terms, the parties' continued relationship--the payment of premiums on the one hand, and the provision of coverage for future shipments on the other--must objectively be viewed as the formation of a new contract compromising what Northern Marine insisted--and the Court of Appeals found--was otherwise a defense to coverage.  As the Florida Supreme Court held in *Bryan, Keefe & Co. v. Howell*, 92 Fla. 295, 305, 109 So. 593, 596 (1926):  "The settlement of a disputed claim may constitute a valid consideration for an accord and satisfaction, a compromise agreement, or a new contract."[10]  Northern Marine's generation and receipt of the COI, and its acceptance of the premium, objectively constituted a forbearance of any pre-existing defense to coverage, which served as consideration for a new agreement under which ITN would continue to pay substantial premiums for coverage of future shipments in exchange for

_____

[10]*See Easley v. Allen*, 367 F.2d 361 (5th Cir. 1966) (novation in settling differences by entering into a new contract); *In re Suncoast Towers South Associates*, 1999 WL 549678, *17 (Bkrtcy. S.D. Fla. 1999); *Sanford v. Abrams*, 24 Fla. 181, 196-97, 2 So. 373, 381 (1887); *Lennar Homes, Inc. v. Dora-Duque*, 972 So. 2d 872, 880 n. 14 (Fla. 3d DCA 2007) (giving up right of appeal was consideration); *Boymer v. Birmelin*, 227 So. 2d 358 (Fla. 3d DCA 1969), *cert. denied*, 237 So. 2d 537 (Fla.), *cert. denied*, 239 So. 2d 102 (Fla.), *cert. denied*, 400 U.S. 926 (1970) (forbearing investigation of alleged wrongdoing was consideration); *Bankers Life & Casualty Co. v. Vadra*, 563 So. 2d 200 (Fla. 3d DCA 1990) ("[A]cceptance of the premium without conditional receipt reinstated the policy").  *Cf. Sovereign Camp, W.O.W. v. Lee*, 125 Fla. 736, 739, 171 So. 526, 528 (1936) ("The insurer . . . accepted [the insured's] reinstatement, sent out the blanks to make proof of his death, thereby recognizing the policy as a subsisting contract, and induced the beneficiary to act in that belief . . .").

Northern Marine's acceptance of the premium for coverage of the lost shipment.

As to the benefit to Northern Marine, there can be no question that the prospect of continued business with ITN constituted adequate consideration for its forgiveness of what the Court of Appeals said was a valid defense to coverage under the policy.  Indeed, the Court of Appeals itself noted that adequate consideration would be found in "the furtherance of Northern's relationship with ITN, or the encouragement of the practice ITN claims it followed: the invariable payment of premiums on every shipment."  464 Fed. Appx. at 794.  That declaration is the law of this case.

Moreover, it is correct.  It is established in Florida, in several contexts, that the prospect of the continuation of an existing business relationship has a tangible value.  For example, a non-competition agreement is enforceable even in an at-will contract, because the prospect of continued employment is sufficient consideration to the employee for such a promise.[11]  Likewise, that prospect supports a cause of action for tortious interference with an advantageous business relationship, based upon "existing or prospective contract rights."  *Central States, Southeast & Southwest v. Florida Society of Pathologists,* 824 So. 2d 935, 940 (Fla. 5th DCA 2002), *review denied,* 844 So. 2d 645 (Fla. 2003).[12]

Therefore, although we believe that the issuance of the COI and the payment and retention of the premium were sufficient consideration for the contract of insurance, the evidence is also

---

[11]*See Coastal Unilube, Inc. v. Smith*, 598 So. 2d 200, 201 (Fla. 4th DCA 1992); *City of South Miami v. Dembinsky*, 423 So. 2d 988, 989 (Fla. 3d DCA 1982); *Wright & Seaton, Inc. v. Prescott*, 420 So. 2d 623, 628 (Fla. 4th DCA 1982); *Tasty Box Lunch Co. v. Kennedy*, 121 So. 2d 52, 54 (Fla. 3d DCA 1960).

[12]*Accord, Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814-15 (Fla. 1994); *Tamiami Trail Tours, Inc. v. Cotton*, 463 So. 2d 1126, 1127 (Fla. 1985); *McCurdy v. Collis*, 508 So. 2d 380, 383 (Fla. 1st DCA), *review denied*, 518 So. 2d 1274 (Fla. 1987); *Landry v. Hornstein*, 462 So. 2d 844, 847 (Fla. 3d DCA 1985).

11

uncontradicted that in accepting the COI notwithstanding its knowledge that the shipment had been lost, and billing for the premium, and then retaining the premium, Northern Marine both suffered the burden of forfeiting what the appellate court held was a valid defense to coverage, and received the anticipated (and later realized) benefit of keeping ITN's future business.  That was ample consideration for the contract to insure this shipment.  Northern Marine's later change-of-mind was the breach of a contract long-since made.

        2.     *Three Theories of Consideration Are Supported by the Uncontradicted Evidence.* Based on the foregoing, there are three theories supported by uncontradicted evidence which require a finding that ITN and Northern Marine made a contract supported by consideration to insure the lost shipment.

        First and most obvious, viewed objectively, regardless of Northern Marine's subjective intentions, Northern Marine made an offer, and ITN accepted it.   Northern Marine knew the shipment had been lost; it knew the COI, purportedly binding coverage had issued (indeed, it solicited the COI); it then billed ITN for the premium; and it then accepted the premium for coverage, notwithstanding its knowledge of the loss.  That was an offer and acceptance--a contract; and the premium and the coverage were obviously consideration to both sides.  Therefore, Northern Marine's denial of coverage was a breach of the contract; and its offer to return the premium--seven months after being sued--could neither undo nor cure that breach.[13]

---

       [13]No theory of mistake of fact is available to Northern Marine, given that Northern Marine was told of the loss.  Moreover, "it is not enough . . . [to] allege merely that there was a mistake of material fact. [The party seeking to avoid the contract] must also allege facts which show that such mistake did not result solely from the want of such care and diligence on his part as are exercised by persons of reasonable prudence under like circumstances."   *Rood Co. v. Board of Public Instruction of Dade County*, 102 So. 2d 139, 141 (Fla. 1958).  Here, there can be no possible claim of "reasonable prudence" in Northern Marine's retention of the premium after being explicitly

Second, even if for some reason Northern Marine's acceptance of the COI with knowledge of the loss, and its acceptance of the premium, did not themselves create a contract, Northern Marine's *retention* of the premium certainly did.  As noted, by definition money has value, and Northern Marine retained the money, and had the use of the money, for more than 20 months before tendering it back.  As we noted, even the slightest consideration is legally sufficient.  Given that the Court's function is not to appraise the adequacy of consideration, but only to determine the fact of consideration, Northern Marine's retention of the premium was tangible consideration for coverage.

Third, even if for some reason Northern Marine's knowledge of the loss and of the COI, and its acceptance and retention of the premium, did not constitute consideration for coverage, the uncontradicted objective evidence still shows that Northern Marine made a new agreement to cover the lost shipment supported by ample consideration.  In essence, it made a new contract in the nature of a novation, compromising what it claimed to be (and the appellate court found to be) a valid defense to coverage, in exchange for ITN's continued business--business not only for Alpha

---

informed of the loss.  Moreover, even when  a mistake of fact may be provable, "a party's right to rescind is subject to waiver if he retains the benefits of a contract after discovering the grounds for rescission."  *Mazzoni Farms, Inc. v. E.I. Dupont De Nemours & Co.*, 761 So. 2d 306, 313 (Fla. 2000).  *See Rosique v. Windly Cove, Ltd.*, 542 So. 2d 1014, 1016 (Fla. 3d DCA 1989).  The Supreme Court said in *Rood* (emphasis added): "[I]f, after acquiring knowledge of the mistake, he *either* remains silent when he should speak *or* in any manner recognizes the contract as binding upon him, ratifies or accepts the benefits thereof, he will be held to have waived his right to rescind. Thereafter, he will be bound by the contract in the same manner as if the mistake of fact had not occurred."  102 So. at 141-42.  Please note that it is not enough for the opposing party to declare that a mistake has been made.  The "right to rescind is subject to waiver if he retains the benefits . . . ."  *Mazzoni.*  A waiver occurs if the opposing party either "remains silent" *or* "accepts the benefits . . . ."  *Rood.*  Here, Northern Marine said nothing for three months after issuance of the COI; even after Northern Marine was sued, it still retained the premium for another seven months before tendering it; and it kept all of the other premiums that ITN had paid in reliance on Northern Marine's acceptance of the COI and retention of the premium on the lost shipment.

Company shipments, but also for ITN's other clients' shipments.  And that business turned out to be lucrative.

As we said, during the three months between the time the COI issued and the time Northern Marine rejected the claim, ITN obtained 36 COI's from Northern Marine totaling premiums of $48,850.67.  And even after the loss, ITN continued to obtain COI's and pay premiums for shipments that took place during that three-month period.  These premiums were paid as consideration to Northern Marine based upon its promise to pay for the loss.  As we established, the prospect of a future business relationship constitutes something of value; it will support a non-competition agreement even in an at-will contract; it will support an action for tortious interference with an advantageous business relationship.  Here we know that this prospect had a tangible economic benefit to Northern Marine, which in fact  was paid a substantial amount of money.  For ample consideration, it made a new contract to cover the loss.

For all of these reasons, ITN is entitled to a Summary Judgment on the issue of coverage.

B.      ITN Is Entitled to Pre-Judgment Interest Under Florida Law.

This is a diversity case under Florida law.  Under Florida law, "prejudgment interest is merely another element of pecuniary damages." *Argonaut Ins. Co. v. May Plumbing Co.*, 474 So. 2d 212, 214 (Fla. 1985), *quoted in McGurn v. Scott*, 596 So. 2d 1042, 1044 (Fla. 1992).[14]  In a

---

[14]*McGurn* was receded from on other grounds in *Westgate Miami Beach, Ltd. v. Newport Operating Corp.*, 55 So. 3d 567, 574 (Fla. 2010), which overruled *McGurn*'s holding that because prejudgment interest is an element of pecuniary damages, the trial court by definition could not issue a final appealable order until it liquidated the amount of prejudgment interest owed, and included that amount in a final judgment.  The Supreme Court in *Westgate* reiterated the holding of *Argonaut* that prejudgment interest is and remains an element of compensatory damages under Florida law, and therefore that an unresolved claim for prejudgment interest does indeed forestall finality for appellate purposes.  *Id*. at 574, 576.  However, the Supreme Court held in *Westgate* that when the trial court reserves on the issue of prejudgment interest, its order nevertheless will be "considered

14

diversity case, the issue of prejudgment interest is governed by state law.[9]  Therefore, ITN's right

to prejudgment interest, and the amount of prejudgment interest, are determined under Florida law.[10]

## III.
## CONCLUSION

It is respectfully submitted that the Court should enter an Order of Summary Judgment

establishing coverage by Northern Marine of the lost shipment at issue, and ruling that prejudgment

interest will be determined under Florida law.

Respectfully submitted,

Michael S. Olin, Esq.
Michael S. Olin, P.A.
169 E. Flagler Street, Suite 1224
Miami, FL 33131

Joel S. Perwin, P.A.
jperwin@perwinlaw.com
169 E. Flagler Street, Suite 1422
Miami, FL 33131
Tel: (305) 779-6090/Fax: (305) 779-6095

By:_____/s_____
Joel S. Perwin
Fla. Bar No: 316814

---

final" for appellate purposes.  It overruled *McGurn* to that extent.

[9]*See AIG Baker Sterling Heights, LLC v. American Multi-Cinema, Inc.*, 508 F.3d 995, 2001 (11th Cir. 2007); *SEB S.A. v. Sunbeam Corp.*, 476 F.3d 1317, 1320-21 (11th Cir. 2007), *citing Argonaut*; *Venn v. St. Paul Fire and Marine Ins. Co.*, 99 F.3d 1058, 1066-67 (11th Cir. 1996); *Royster Co. v. Union Carbide Corp.*, 737 F.2d 941, 948 (11th Cir. 1984).

[10]As noted, the calculation is ministerial.  If the Court finds coverage, ITN will submit an affidavit liquidating the amount, for inclusion in the Judgment.

15

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 29th day of June, 2012, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: s/Michael S. Olin_____

Michael S. Olin

Fla. Bar No: 22031-

16

## SERVICE LIST

Michael S. Olin, Esq.
Michael S. Olin, P.A.
igarcia@olinlawfirm.com
169 E. Flagler Street
Suite 1224
Miami, FL 33131
Tel: (305) 677-5088
Fax: (305) 677-5089
Co-Counsel for Plaintiffs
via CM/ECF

Mitchell L. Shadowitz, Esq.
Shadowitz Associates
chatdo8@aol.com
551 NW 77th Street
Suite
102
Boca Raton, FL 33487
Tel: (561) 241-6740
Fax: (561) 241-6741
Counsel for Defendant Northern Marine
via CM/ECF

Jonathan S. Cooper, Esq.
Blanck & Perry
jcooper@shiplawusa.com
5730 SW 74th Street
Suite 700
Miami, FL 33143
Tel: (305) 663-0177
Fax: (305) 663-0146
Counsel for Objector Fidelity & Marine
via CM/ECF